# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 10-86 (consolidated with) 10-91, 10-92, 10-96, 10-97, 10-99, 10-100, 10-115, 10-117, and 10-118

CENTRAL LOUISIANA AMBULATORY SURGICAL CENTER, INC. (BRIDGET HUIE)

VERSUS

PAYLESS SHOESOURCE, INC.

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 08-02882
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

## ULYSSES GENE THIBODEAUX
### CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and David E. Chatelain,[*] Judges.

**Gremillion, J., concurs and assigns written reasons.**

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

Roger Anthony Javier
The Javier Law Firm
800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163
Telephone: (504) 599-8570
COUNSEL FOR:
       Defendant/Appellant - Payless Shoesource, Inc.

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Richard Bray Williams**
**Williams Family Law Firm, LLC**
**P. O. Box 15**
**Natchitoches, LA 71458-0015**
**Telephone: (318) 352-6695**
**COUNSEL FOR:**
> **Plaintiff/Appellee - Central Louisiana Ambulatory Surgical Center, Inc. (Bridget Huie)**

**THIBODEAUX, Chief Judge.**

The plaintiff-appellee, Central Louisiana Ambulatory Surgical Center, Inc. (CLASC), filed ten disputed claim forms with the Office of Workers' Compensation (OWC) for the underpayment of medical bills for services provided by CLASC to ten injured workers. The named defendants, all appellants, were the employers of the injured workers: Payless Shoesource, Inc. (one worker); Gilchrist Construction Co. (one worker); and, Rapides Parish School Board (eight workers). The defendants-appellants will be collectively referred to as "the Employers."

The disputes arose from a web of contracts with a preferred provider organization (PPO) which discounted its payments to CLASC by twenty percent (20%). This 20% reduction in medical fee reimbursement was calculated upon a fee that had already been reduced by ten percent (10%) in accordance with La.Admin. Code tit. 40, part I, § 2507 promulgated in conjunction with La.R.S. 23:1034.2 of the Louisiana Workers' Compensation Act (LWCA or the Act). Following two hearings on the partially consolidated claims, the OWC entered judgment in favor of CLASC on each of the ten claims for underpayments ranging from approximately $137.00 to $2,200.00. The OWC also awarded CLASC $1,500.00 in attorney fees, along with a penalty of $2,000.00, on each of the ten claims. The Employers appealed the judgment.[1]

Finding that the issues, as well as the plaintiff and the pertinent contracts, are the same in all ten cases, we have consolidated the ten appeals. For the reasons set forth below, we affirm the OWC's awards for underpayments to CLASC.

---

[1]CLASC answered the appeal in each case, in addition to filing its opposition. We note, however, that CLASC's two-page answer does not contain any assignments of error. Accordingly, we will not address the errors assigned by CLASC in its opposition brief in appeal number 10-86 (OWC 08-02882).

Finding, however, that the Employers reasonably controverted the claims by CLASC, we reverse all awards for attorney fees and penalties.

I.

## ISSUES

We must decide:

(1)    whether the PPO contracts are legally valid and enforceable against the established, mandatory fee rates set forth in the medical fee reimbursement schedule of the LWCA;

(2)    whether the claims of CLASC for penalties and attorney fees have prescribed; and,

(3)    whether the Employers in these consolidated cases reasonably controverted CLASC's claims of underpayments, thereby rendering the OWC's assessment of penalties and attorney fees against the Employers a reversible manifest error.

II.

## FACTS AND PROCEDURAL HISTORY

In December of 1995, the business director of CLASC signed a document entitled "Affordable Health Care Concepts Participating Provider Agreement." The document was signed by Affordable Health Care Concepts (Affordable) in February 1996 and became effective the following month. The document's stated purpose was to create a "Preferred Provider Panel" which would "agree to comply with the reimbursement mechanisms established by AFFORDABLE." It further stated that Affordable would "offer to certain Payors the opportunity to participate" in a PPO plan that used the services of the "Preferred Provider Panel."

The nine-page Affordable PPO document addressed requirements that medical providers had to meet, such as cooperating with "Payors" in "expediting the

2

return to work of Participating Patients" in workers' compensation cases, as well as maintaining staff privileges, professional licenses, and professional liability insurance. Couched in terms relating to what the "Payor" agreed to pay, the Affordable PPO document referenced "the lesser of the Provider's charges or the fee schedule listed in Appendix A." Attached to the Affordable PPO Agreement is a *one-page, unsigned, undated* document entitled "Appendix A – First Health Outpatient Care Network Reimbursement" (First Health Appendix or Appendix A). The First Health Appendix does not contain the name of the main document or bear reference to the Affordable PPO document to which it is attached.

However, Subpart (D) of the First Health Appendix provided that reimbursement from workers' compensation Payors would not exceed 80% of the maximum amount payable under governing state law, whether the state rules were in existence at the time of the execution of the agreement or established at a later time. Affordable changed its operating name to First Health Group Corporation (First Health) at some point in time, but apparently no efforts were made to notify CLASC of the corporate changes or to provide proper documentation in that regard.

On January 1, 2002, First Health entered into an agreement with Gallagher Bassett Services, Inc. (Gallagher). The title of that document was "Workers' Compensation Managed Care Services Agreement" (Gallagher/First Health Agreement). It provided that First Health would perform services including clinical management, bill review, access to the First Health network, and "Front-End Processing" (electronic data capture from paper claims documents). Gallagher was identified as the "Client" in the agreement, and the entities for whom the "Client" would make managed care services available were referred to as "Sub-Clients." The document further provided that neither First Health nor Gallagher, as "Client," would render any medical services to the claimants and that Gallagher was responsible for

3

"all decisions regarding the payment or denial of payment of medical benefits to Claimants."

While clearly dated January 1, 2002, on the first line identifying the parties, the Gallagher/First Health Agreement was signed by Gallagher on January 12, 2005, and was signed by First Health on January 24, 2005. In addition to the internal date discrepancies in the Gallagher/First Health Agreement, vague and disparate terminology further lends to the confusion where the Affordable PPO document refers to the Employer-defendants in these cases as "Payors" while the Gallagher/First Health Agreement refers to them as "Sub-clients."

In addition to the above-described contract between CLASC and Affordable, and the above contract between Gallagher and First Health, each of these consolidated cases contains approximately five other contracts, which are between Gallagher or First Health and the adjusting companies, or between Gallagher and the Employers. There are no contracts between CLASC and the Employers or the Employers' insurance company. Notably, the only contract that CLASC signed is the Affordable PPO contract.

Beginning in June 2005, CLASC provided surgeries and medical procedures for ten injured employees of the three Employers in these ten consolidated cases.[2] When CLASC received the Employers' payments on its medical bills, the payments were reduced by the ten percent (10%) mandatory reduction of the LWCA; this 10% reduction is not an issue of dispute. The reduced payments were then reduced again by twenty percent (20%) for the PPO discounts, as reflected by Gallagher on the explanation of benefits (EOB) forms that it sent to CLASC in each

_____

[2]Neither the injuries nor the medical procedures are at issue in these cases.

4

case. CLASC filed the ten disputed claims forms against the Employers for the 20% payment reductions on CLASC's bills for medical services.

III.

**LAW AND DISCUSSION**

**Validity of the PPO Discount Agreements Under the Framework of the LWCA**

The Employers argue that the OWC erred in concluding that the PPO discounts are not authorized by the LWCA. We find no error in the OWC's judgment. An examination of the underlying goals of the LWCA instructs us as to the validity of the PPO discounts.

*(1) Goals of the LWCA*

An early decision of the Louisiana Supreme Court described the LWCA as follows:

> The act, which is social legislation, was passed for the joint benefit of labor and management in order to insure that employees who became disabled as a result of their labors in hazardous industries would have, during the period of their disability, a weekly income for the upkeep of themselves and their families. . . . In order that this end might be accomplished, the Legislature provided for sacrifices to be made by both the employer and the employee. The employee was required to waive the right granted him under the general law, Article 2315 of the Civil Code, in consideration of receiving a fixed percentage of his wages during the period of disability. The employer, on the other hand, was deprived of the defenses afforded to him by the general law and he was assured that, in case any of his employees were injured, they would be entitled to no more than the amount stipulated in the statute as compensation during the period of disability. . . .

*Atchison v. May*, 201 La. 1003, 10 So.2d 785, 788 (La.1942).

As *Atchison* demonstrates, the LWCA is remedial social legislation. The Legislature's goal was to relieve the injured employee of the burden of paying for his

5

own medical care and to replace his lost wages on a temporary or permanent basis, as needed. The purpose of the LWCA is to advance the legitimate social interest of ensuring that employees are not reduced to poverty because of an occupational or traumatic injury. By providing for complete reimbursement of medical fees, the Act intends for injured workers to receive the same high level of medical care as any other person seeking medical assistance.

Not only is the workers' compensation statutory framework social legislation, but it is also specifically-regulated legislation. That is, it is separate and apart from tort law or personal injury law, and it occupies a specially-regulated place in Louisiana law. Consequently, those provisions dealing with workers' compensation must be strictly followed. No deviation from the statutory text is allowed.

### (2) Validity of the PPO Discount Agreement

It is with that backdrop in mind that we consider the issue of whether the PPO agreement is in violation of the LWCA and the reimbursement schedule. The Employers argue that the OWC erred in finding that the PPO agreement violates the LWCA. Specifically, they assert that though the OWC correctly held that La.R.S. 23:1033 does not prohibit contracting below the fee schedule, the OWC's remaining decisions conflict with the plain text of the LWCA. We disagree.

The Employers' argument fails because it attempts to view specific sections of the LWCA in a vacuum, without considering the interrelationship between the sections or the overall purpose of the Act. Considering these factors together, the PPO discounts taken by the Employers are simply not authorized under the LWCA.

Louisiana Revised Statutes 23:1203 provides that employers are liable for the payment of medical expenses. Notably, La.R.S. 23:1203(B) states:

The obligation of the employer to furnish such care, services, treatment, drugs, and supplies, whether in state or out of state, is limited to the reimbursement determined to be the mean of the usual and customary charges for such care, services, treatment, drugs, and supplies, as determined under the reimbursement schedule annually published pursuant to R.S. 23:1034.2 or the actual charge made for the service, whichever is less. Any out-of-state provider is also to be subject to the procedures established under the office of workers' compensation administration utilization review rules.

Moreover, La.R.S. 23:1033 provides that: "No contract, rule, regulation or device whatsoever shall operate to relieve the employer, in whole or in part, from any liability created by this Chapter except as herein provided." These sections, as well as the LWCA as a whole, prohibit any contracts that would operate to relieve an employer of liability created by the LWCA. In his concurring opinion to this court's *en banc* opinion in *Beutler England Chiropractic Clinic v. Mermentau Rice, Inc.*, 05-942, p. 9 (La.App. 3 Cir. 5/31/06), 931 So.2d 553, 561 (citing his dissenting opinion in *Beutler England Clinic v. Market Basket No. 27*, 05-952 (La.App. 3 Cir. 12/30/05), 919 So.2d 816, 821), Judge Peters stated:

[T]o the extent that the PPO contract purports to further limit the employer's liability for medical care, it runs afoul of La.R.S. 23:1033 and may not serve as a basis to reduce the amount owed to Beutler England for the treatment of [the injured employee].

This court recently revisited this issue in *Agilus Health (Allison Taylor) v. Accor Lodging North America*, 09-1049 (La.App. 3 Cir. 3/10/10), 32 So.3d 1120, and affirmed the trial court's judgment that the PPO agreement between the parties violated the LWCA. Our position on the issue has not changed.

Here, the PPO contract by its very terms purports to reduce or relieve the employer's liability for workers' compensation medical payments from the full amount of the fee schedule to only eighty percent (80%) of the fee schedule. This

contractual maneuver, however, flies in the face of the language and purpose of the Act.

The LWCA is highly regulated. As CLASC aptly points out, the Act regulates the amounts owed for weekly benefits, maximum and minimum compensation rates, mileage reimbursement, medical reimbursement, attorney fees, and settlements. Almost every conceivable scenario is addressed in the scheme of the LWCA. If the Legislature intended for PPO contracts to fall into the scheme of workers' compensation, it would have addressed them in the Act. Instead, the Act specifically prohibits manipulation of its mandatory provisions. The Employers' attempt to do so through PPO contracts, is, therefore, impermissible.

Moreover, the Employers' actions violate the social legislative purpose of the workers' compensation act. Not only do the PPO contracts purport to limit the employer's liability for medical care, but they also threaten the foundation of the workers' compensation system—namely, providing quality medical care to injured workers. When medical providers are forced to accept less reimbursement for the same quality of care they provide to paying patients, it is likely that they will be reluctant to participate in the workers' compensation program. That reluctance will then lead to a fewer number of providers accepting workers' compensation patients, and consequently, substandard care. We cannot allow the workers' compensation system to be compromised in such a way.

*(3) The PPO Discount Agreements and the
Louisiana Reimbursement Schedule*

The Employers also argue that the Fee Schedule allows for, rather than prohibits, PPO discounting. Specifically, the Employers rely on La.Admin. Code tit. 40, part I, § 4733 in support of that argument. Section 4733(A)(2)(b), however, provides that if a hospital or medical fee schedule contains "pre-negotiated rates," the

8

pre-negotiated rate must be negotiated between the provider and the carrier/self-insured employer. Here, CLASC did not negotiate any contracts with the Employers. Accordingly, the criteria of Section 4733 have not been met, and the Employers' reliance on this Section is misplaced.

## (4) Notice to CLASC

CLASC argues that even if the PPO network reduction did not violate the LWCA and the Fee Schedule, the reductions would remain non-binding and unenforceable under the express provisions of La.R.S. 40:2203.1, since the Employers gave no prior notice to CLASC as required by the statute. The OWC's silence on the issue renders it implicitly denied.

Louisiana Revised Statutes 40:2203.1 governs PPO agreements with health care providers in Louisiana. It provides in pertinent part:

> A. Except as otherwise provided in this Subsection, the requirements of this Section shall apply to all preferred provider organization agreements that are applicable to medical services rendered in this state and to group purchasers as defined in this Part. The provisions of this Section shall not apply to a group purchaser when providing health benefits through its own network or direct provider agreements or to such agreements of a group purchaser.
>
> B. A preferred provider organization's alternative rates of payment shall not be enforceable or binding upon any provider unless such organization is clearly identified on the benefit card issued by the group purchaser or other entity accessing a group purchaser's contractual agreement or agreements and presented to the participating provider when medical care is provided. When more than one preferred provider organization is shown on the benefit card of a group purchaser or other entity, the applicable contractual agreement that shall be binding on a provider shall be determined as follows:
>
> . . . .
>
> (5) When no benefit card is issued or utilized by a group purchaser or other entity, written notification shall

9

be required of any entity accessing an existing group purchaser's contractual agreement or agreements at least thirty days prior to accessing services through a participating provider under such agreement or agreements.

The record in these proceedings is clear that notice was not given to CLASC as required by La.R.S. 40:2203.1. Identification cards were not issued for workers' compensation matters, nor was a written notice issued to the providers containing the PPO networks. We conclude and hold that the specific notice provisions of La.R.S. 40:2203.1 apply to workers' compensation patients in a PPO network.

Our decision on the necessity of notice is consistent with the very recent opinion of our court in *Gunderson v. F.A. Richard & Associates, Inc.*, 09-1498 (La.App. 3 Cir. 6/30/10), __ So.3d __. We agree entirely with *Gunderson*.

**Timeliness of Claims for Penalties and Attorney Fees**

The Employers contend that the claims for penalties and attorney fees have prescribed. The Employers argue that the one-year prescriptive period found in La.Civ.Code art. 3492 applies to claims for penalties and attorney fees. Specifically, they attempt to persuade this court to join our colleagues in the first and fifth circuit courts of appeal and to adopt the holding of *Craig v. Bantek West*, 03-2757 (La.App. 1 Cir. 11/17/04), 885 So.2d 1234, *writ denied*, 04-2995 (La. 3/18/05), 896 So.2d 1004.

We disagree with the Employers' position. The Employers ignore the plain text of La.R.S. 23:1201(F)(4), and they ignore the past jurisprudence of this court. Moreover, the cases upon which the Employers rely are distinguishable on their facts.

The Employers ignore the applicable statute on this issue—namely, La.R.S. 23:1201(F)(4) which states:

In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the health care provider. This Subsection shall not be construed to provide recovery of more than one penalty or attorney fee.

The statute, therefore, provides that the medical provider's claims for penalties and attorney fees are separate and distinct from that of the injured employee and do not accrue until the medical provider's underlying claim for payment is adjudicated. Because the health care provider cannot seek an award of statutory penalties and attorney fees from a defendant employer/insurer until the health care provider prevails on his claim for payment of his fee, that cause of action had not yet accrued at the time of trial.

The Employers urge us to adopt *Craig* and its progeny, which support the position that a one-year prescriptive period governs the cause of action for penalties and attorney fees. *Craig* and its progeny are distinguishable, however, because they do not address statutory penalties and attorney fees owed to a *health care provider* under La.R.S. 23:1204(F)(4), but rather address benefits owed to claimants.

Not only do the Employers ignore the plain text of the statute at issue, but they also ignore this court's prior rulings on this issue. Specifically, in *Rave v. Wampold Cos.*, 06-978, p. 12 (La.App. 3 Cir. 12/6/06), 944 So.2d 847, 855, we stated, "It is clear from a reading of the jurisprudence that when claims for penalties and attorney fees accompany the claim for benefits, if the underlying claims have not prescribed, neither have the claims for attorney fees and penalties."

Here, the claims for underpayment or late payment and legal interest filed by CLASC have not yet prescribed. Thus, the underlying claims for attorney fees and penalties have not yet prescribed.

## Reasonable Controversion of Claims of Underpayments

Pursuant to La.R.S. 23:1201(F)(4), the OWC awarded $2,000.00 in penalties and $1,500.00 in attorney fees in each of the ten consolidated cases for the Employer's underpayment of CLASC's medical bills for the services it provided to each injured worker. The workers' compensation judge stated that the single violation leading to the $2,000.00 penalty in each case was the employer's "error of thinking" that it could rely upon a PPO contract. The determination by the OWC that an employer or insurer should be cast with penalties and attorney fees is a question of fact subject to the manifest error or clearly wrong standard of review. *Authement v. Shappert Eng'g*, 02-1631 (La. 2/25/03), 840 So.2d 1181.

The Employers argue that penalties and attorney fees should not have been assessed against them because they reasonably controverted the claims of CLASC for underpayments due to the existence of valid PPO contracts setting forth the rates for the payments actually submitted. Louisiana Revised Statutes 23:1201(F)(2) provides that penalties and attorney fees "shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer had no control."

The Louisiana Supreme Court in *Authement* articulated the reasoning behind the imposition of penalties and fees as follows:

> As stated in *Williams v. Rush Masonry, Inc.*, 98-2271 (La. 6/29/99), 737 So.2d 41, 46, awards of penalties and attorney fees in workers' compensation cases are essentially penal in nature. The purpose of imposition of penalties and attorney fees is to discourage indifference and undesirable conduct by employers and insurers. The crucial inquiry in determining whether to impose penalties and attorney fees on an employer is whether the employer had an articulable and objective reason to deny benefits at the time it took action. *Id*.

*Authement*, 840 So.2d at 1188.

While we find that the PPO contracts in these cases did not have legal effect for the rate reductions applied, we find that the Employers did have "articulable and objective" reasons to reduce the payments to CLASC at the time that the Employers took that action. As previously indicated, attached to the Affordable PPO Agreement in the record is an unsigned, undated "Appendix A" bearing the name of First Health.

The First Health Appendix discusses reimbursement formulas containing multipliers, conversion factors, medical procedure codes, pricing methodologies, existing guidelines, and it shows various group payments, fee schedules, and specific medical service pricing for named procedures. Then, under section (D)(1), the First Health Appendix provides that reimbursement from workers' compensation payors shall not exceed eighty percent (80%) of the maximum amount payable under the state's regulating rules, which ostensibly refers to the LWCA. The First Health Appendix further provides that the reimbursement rate shall apply whether the state rules are in existence at the time of the execution of the agreement or established at a later time.

In case 10-99 of these consolidated cases (OWC 08-02851), CLASC provided medical services to a Rapides employee, Forrest Robinson, on May 18, 2007. CLASC billed charges of $1,198.00. The Third Party Administrator, Gallagher Bassett, generated a payment and an EOB. The EOB showed the total charges of $1,198.00, then subtracted $119.80 (10%), described as a "Bill Review Deduction." More specifically, however, this initial 10% reduction of the payment to CLASC is the mandatory reduction pursuant to La.Admin. Code tit. 40, part I, § 2507, which governs the rate for outpatient care and which is promulgated in accordance with the LWCA at La.R.S. 23:1034.2. The CLASC bill for services was thus reduced to $1,078.20 per the LWCA. The Gallagher EOB then showed an

13

additional reduction for a "PPO Discount" of $215.64, which equates to a 20% discount off of the $1,078.20, resulting in a "Recommended Allowance" of $862.56 (or 80% of $1,078.20). The amount then submitted by Rapides to CLASC as payment for its medical services to Forrest Robinson was $862.56.

Accordingly, the $215.64 underpayment claimed by CLASC in that case was the amount calculated by Gallagher using the method set forth under section (D)(1) of the First Health Appendix, which was attached to the Affordable PPO contract between CLASC and Affordable. Likewise, this calculation was used in the other nine payments in these ten consolidated cases, all containing the Affordable PPO contract and the First Health Appendix described above.

Therefore, while we have found that this web of PPO agreements is not valid under the LWCA and cannot usurp the rates and fee schedules established by the LWCA, specifically La.R.S. 23:1203 and 23:1034.2, the contracts form a reasonable basis for controverting the claims of CLASC regarding underpayments. *See Henderson v. Pavy*, 96-90 (La.App. 3 Cir. 5/15/96), 688 So.2d 1048 (an employer's failure to pay the amount remaining on the doctor's medical bill for a workers' compensation claimant did not warrant an assessment of penalties and attorney fees where there was a dispute regarding a lower estimate); *see Baca v. Natchitoches Parish Hosp.*, 06-1132 (La.App. 3 Cir. 2/7/07), 948 So.2d 1205 (after quoting the language regarding an employer's articulable and objective reason to deny payment, no penalties and attorney fees were assessed where the employer had sufficient grounds to dispute the claim).

In the ten consolidated cases, while we find that the Employers underpaid CLASC due to their reliance upon the PPO contracts, we find that the OWC manifestly erred in imposing penalties and attorney fees against the Employers, and we reverse.

14

IV.

## **CONCLUSION**

Based upon the foregoing, all of the OWC awards for underpayments to CLASC, beginning as low as $137.00 in one of the ten consolidated cases and reaching as high as $2,200.00 in one case, are affirmed. With regard to the $2,000.00 penalty and the $1,500.00 attorney fee in each of the ten cases, we reverse. The existence of the PPO contracts, though the contracts are invalid, provided an articulable basis for the Employers to pay the additionally discounted amounts, at the time the Employers took action, thus controverting the claims of CLASC. Costs of this appeal are assessed to the Employers.

**AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

# STATE OF LOUISIANA

## COURT OF APPEAL

## THIRD CIRCUIT

**10-86 (Consolidated with) 10-91, 10-92, 10-96, 10-97, 10-99, 10-100, 10-115, 10-117, and 10-118**

## CENTRAL LOUISIANA AMBULATORY SURGICAL CENTER, INC.

## VERSUS

## PAYLESS SHOE SOURCE, INC.

**GREMILLION, Judge, Concurring.**

While I agree with the majority's result, I disagree with the majority's reasoning. The majority invalidates the PPO agreement on the basis that La.R.S. 23:1033 prohibits the contractual limitation of an employer's liability under the Workers' Compensation Act. The PPO agreement in no way limits the employer's liability; rather, such contracts reflect the sound policy underlying La.R.S. 23:1034.2(E), which provides, "Nothing in this Section shall prevent a health care provider from charging a fee for such care, services, treatment, drugs, or supplies that is less than the reimbursement established by the reimbursement schedule." When a provider and an employer or workers' compensation insurer enter into a PPO contract, they are agreeing that the provider will only charge a certain amount for specific care, services, and treatment procedures. The fact that they might charge a patient who is not a member of the PPO a greater amount than an employee member does not render the PPO agreement invalid under the Workers' Compensation Act, nor does it render the employee's care substandard.

The majority also concludes that the PPO agreement runs afoul of the social contract implicit in the Workers' Compensation Act: the employee is guaranteed payment of his medical expenses and indemnity in exchange for recovery of a lesser

amount. It states (emphasis added):

> Not only do the PPO contracts purport to limit the employer's liability for medical care, but they also threaten the foundation of the workers' compensation system—namely, providing quality medical care to injured workers. When medical care providers are *forced* to accept less reimbursement for the same quality care they provide to paying patients, it is likely that they will be reluctant to participate in the workers' compensation program. That reluctance will then lead to a fewer numbers of providers accepting workers' compensation patients, and consequently, substandard care.

This conclusion ignores the basic PPO structure. The PPO agreement is just that—an agreement. No provider is forced to accept anything. They can choose to not participate in the PPO. This reasoning also ignores the fundamental purpose underlying the reimbursement schedule: to cap the amount providers can charge employees for work-related injury expenses.

The manner in which billing is performed by the health care providers should not determine the validity of a PPO agreement. I am mindful of this court's decision in *Agilus Health v. Accor Lodging N.A.*, 09-1049 (La.App. 3 Cir. 3/10/10), 32 So.3d 1120, *writ granted*, 10-800 (La. 6/18/10), ___ So.3d ___, in which a PPO agreement was invalidated on the ground that it violated La.R.S. 23:1203(B). As the majority stated, "[The defendants], however, ignore the fact that this provision [La.R.S. 23:1034.2] does not allow the employer to pay less than the scheduled amount if the provider charges that amount or more." *Id.,* at 1121. What constitutes the amount the provider charges is, in my mind, the critical issue.

For instance, would the misplacement of a decimal point by the provider's billing clerk change the amount actually charged from $100.00 to $1,000.00? Under the *Agilus Health* case, if the PPO paid the $100.00 it and the provider had agreed to, it is conceivable the provider would be subject not only to paying the difference between the agreed-to and the scheduled amounts, but also to a $2,000.00 penalty and

attorney fees.

Statutes governing the same subject are to be read *in pari materia*. La.Civ.Code art. 13. Further, the standard rules of statutory construction provide that (1) one presumes that every provision of law was intended to serve a purpose; (2) one does not presume that the lawmaker intended for any part of a law to be meaningless; (3) one presumes the lawmaker to have enacted the law with full knowledge of all other laws pertaining to the same subject matter; (4) the duty of the courts is to interpret a provision of law which harmonizes and reconciles it with other provisions pertaining to the same subject matter; and (5) of two or more possible interpretations of a law, "that which affords a reasonable and practical effect to the entire act is preferred to one that renders part of the act nugatory." *Ransome v. Ransome*, 01-2361, 8 (La.App. 1 Cir. 6/21/02), 822 So.2d 746, 754. In the present matter, as in *Agilus Health*, the literal application of La.R.S. 23:1203, without reference to La.R.S. 23:1034.2, renders section 1034.2(E) superfluous.

The PPO agreement does not, in my opinion, violate the Workers' Compensation Act. I fully agree with Judge Amy's dissent in the *Agilus Health* case. The PPO agreement was precisely the sort of vehicle envisioned when Section 1034.2(E) was enacted.

Rather, I agree with the majority in ruling that the PPO failed to comply with the notice requirements of La.R.S. 40:2203.1. The majority has aptly characterized the relationship between the parties hereto as "a web of contracts." The plaintiff may be even more felicitous in describing a "convoluted series of at least four contracts." In addition, CLASC had no other notice that it was to provide services under a PPO agreement at any other time until Gallagher Bassett notified it of such at the time of payment. Surely, leaving the provider so completely uninformed was exactly what

the legislature sought to avoid when it enacted LARS 40:2203.1.

I note, as did the majority, that this was the basis for this court's decision in the very recent case of *Gunderson v. F.A. Richard & Assoc., Inc.*, 09-1498 (La.App. 3 Cir. 6/30/10), ___ So.3d ___. Also, our colleagues on the fourth circuit have found that no party has the right to enforce the PPO agreement against a health care provider when the notice requirements of Section 2203.1 are not followed. *Touro Infirmary v. American Maritime Officer*, 09-697 (La.App. 4 Cir. 11/9/09), 24 So.3d 948.

I agree with the majority on the issue of the awards of penalties and attorney fees. I concur with the result, given that the PPO failed to comply with the dictates contained in La.R.S. 40:2203.1.